```
UNITED STATES BANKRUPTCY COURT          FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
In re:                         :
                               :
TRICO MARINE SERVICES, INC.,   :        Chapter 11 (Confirmed)
et al.,                        :        Case No.: 04-17985(SMB)
                               :
            Debtors.           :
-------------------------------X
STEVEN SALSBERG and GLORIA     :
SALSBERG,                      :
                               :
            Plaintiffs,        :
                               :
                               :
       - against -             :        Adv. Proc. No. 05-2313
                               :
TRICO MARINE SERVICES, INC.,   :
TRICO MARINE ASSETS, INC.,     :
TRICO MARINE OPERATORS, INC.   :
and TRICO MARINE               :
INTERNATIONAL, INC.,           :
                               :
            Defendants.        :
-------------------------------X
```

**OPINION AND ORDER GRANTING REARGUMENT, ADHERING
TO THE COURT'S ORIGINAL DECISION AND GRANTING
IN PART AND DENYING IN PART PLAINTIFFS'
MOTION TO SUPPLEMENT THE RECORD**

**A P P E A R A N C E S:**

KIRKLAND & ELLIS LLP
Attorneys for Defendant
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675

    Robert G. Burns, Esq.
    Robert R. Urband, Esq.
        Of Counsel


STEVEN C. SALSBERG
Plaintiff Pro Se
205 West 88th St., #2D
New York, NY 10024

```
LAW OFFICE OF JOSEPH P. GARLAND
Attorney for Gloria Salsberg
275 Madison Ave., 11th Floor
New York, NY 10016

     Joseph P. Garland, Esq.
          Of Counsel
```

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

The plaintiffs ("Salsberg") commenced this timely adversary proceeding to revoke the confirmation order entered on January 21, 2005. In an opinion and order dated January 6, 2006, the Court granted the motion for summary judgment made by the defendant reorganized debtors ("Trico") on the ground that the revocation order could not protect innocent third parties, and would cause substantial uncertainty. Salsberg v. Trico Marine Servs., Inc. (In re Trico Marine Servs., Inc.), 337 B.R. 811, 816 (Bankr. S.D.N.Y. 2006)("Opinion"). Due to a misunderstanding on my part, I thought that the matter had been fully submitted at the time that the decision was rendered. Salsberg, however, had reserved the right to supplement the record.

Salsberg subsequently supplemented the record, and also sought leave to supplement it a second time. Trico opposed the second supplement, and urged me to adhere to the original disposition. Treating Salsberg's first supplement as a motion for reargument, I grant the motion, but upon reconsideration, adhere to my original

decision.  In addition, the motion to supplement the record for a second time is denied, except to the extent that Trico's 2005 Form 10-K, issued after the first supplement and submitted with the second supplement, will be deemed part of the record.

**BACKGROUND**

The background is set out in the Opinion, familiarity with which is assumed.  Only the facts necessary to provide context to this decision are set forth.

Trico's plan went effective on March 15, 2005.  On that date, Trico cancelled the outstanding Notes representing approximately $275 million, and issued 10 million shares of New Common Stock to the Noteholders.  Under a plan agreement with the Noteholders, the holders of the Old Common Stock, which was cancelled under the plan, received warrants exercisable for up to 10% of the New Common Stock.  The New Common Stock is traded through NASDAQ.

On or about October 24, 2005, Trico issued an additional 4,273,000 shares of New Common Stock through a secondary offering at a public offering price of $24.00.  According to Trico's 2005 Form 10-K, there are 14,638,103 outstanding shares of New Common Stock.  The difference between the latter amount and the New Common Stock issued under the plan or through the secondary offering may

be explained by the exercise of some of the warrants issued to the holders of the Old Common Stock.

The New Common Stock is actively traded. Trico's counsel represented at a March 14, 2006 hearing that during the preceding three months, the average daily trading volume for Trico common stock was 143,000 shares. (Transcript of hearing, held Mar. 14, 2006, at 19-20)("Tr.") In other words, approximately 13 million shares exchanged hands during the three month period. Consequently, while there may still be former Noteholders who hold the New Common Stock issued to them under the plan, ownership of the New Common Stock has turned over several times, at least on a statistical basis.

Finally, the provenance of a current shareholder's stock would be hard to discern. Salsberg concedes that it would be very difficult, if not impossible, to distinguish those whose New Common Stock was issued under the plan from those whose shares originated under the secondary offering. (See Tr. 6-14.)

**DISCUSSION**

**A.   Introduction**

Section 1144 governs revocation of a confirmed chapter 11 plan. It states:

> On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall -
>
> (1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and
>
> (2) revoke the discharge of the debtor.

"Revocation" is not defined in the Bankruptcy Code. In legal parlance, it means an annulment, cancellation or reversal, typically of an act or power. BLACK'S LAW DICTIONARY 1346 (8th ed. 2004.) It is synonymous with "rescission." See WEBSTER'S THIRD NEW INT'L DICTIONARY UNABRIDGED 1930 (1981)(defining "rescission" to mean "an act of rescinding, annulling, or vacating or of cancelling or abrogating (as by restoring to another party to a contract or transaction what one has received from him)").

Section 1144 includes two express requirements: the revocation order must (1) revoke the discharge, and (2) protect those who acquired rights in good faith reliance on the confirmation order. In addition, the revocation of the confirmation order reinstates

5

the status quo ante. In re Ogden Modulars, Inc., 207 B.R. 198, 200 (Bankr. E.D. Mo. 1997); Official Comm. of Unsecured Creditors v. Michelson (In re Michelson), 141 B.R. 715, 730 (Bankr. E.D. Cal. 1992). Accordingly, the Court cannot revoke the plan unless "it can fashion an order that would revoke the debtor's discharge, restore the status quo existing before confirmation and protect those who relied in good faith on confirmation." S N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.), 171 B.R. 666, 669 (Bankr. D. Ariz. 1994).

If a plan, even a substantially consummated plan, simply distributes money to creditors, revocation may not pose a significant problem. The reinstated debtor-in-possession can sue to recover the distributions under the plan. Cf. Fulton Cty. Silk Mills v. Irving Trust Co. (In re Lilyknit Silk Underwear Co.), 73 F.2d 52, 53-54 (2d Cir. 1934)(discussing a bankruptcy trustee's inherent equitable authority to recover payments made pursuant to a confirmation order that is subsequently reversed). Alternatively, the court can treat a dividend paid to a creditor as an offset against the creditor's allowed claim, i.e., as a pre-plan distribution. See Kelly v. Giguere (In re Giguere), 165 B.R. 531, 537 (Bankr. D.R.I. 1994). Lastly, vendors who dealt with the reorganized debtor and were paid would not require protection; unpaid vendors could be granted an administrative priority in the

6

reinstated proceeding.


More complex plans involving transactions among the debtor, its creditors, and third parties obviously present greater problems.  If stock is issued under a plan to creditors in satisfaction of their debts, restoration of the status quo requires the reinstatement of the debts and the cancellation of the stock.  In addition, innocent parties that purchased the stock in the market would have to be protected under the express language of § 1144.  The Opinion conflated these two requirements, but they are not necessarily the same.  Those courts that have dismissed revocation complaints in such cases on equitable mootness grounds have properly focused on both concerns: the ability to reinstate the status quo ante and the ability to protect shareholders who purchased stock following the entry of the confirmation order.  E.g., Chang v. Servico, Inc. (In re Servico, Inc.), 161 B.R. 297, 301-02 (S.D. Fla. 1993)(refusing to revoke confirmation order where, inter alia, several million shares of stock were issued under the plan and had been actively traded); Almeroth v. Innovative Clinical Solutions, Ltd. (In re Innovative Clinical Solutions, Ltd.), 302 B.R. 136, 140-41 (Bankr. D. Del. 2003)(refusing to revoke order confirming plan under which new common stock was issued to creditors and holders of old common stock, and the new common stock was actively traded in the over-

the-counter market).

**B.      Salsberg's Proposal**

Salsberg proposes that I revoke Trico's plan, cancel all of the New Common Stock and warrants, including the New Common Stock that was issued in the secondary offering, and give all of the current stockholders the reinstated Notes (and additional value, if necessary) as protection.  (<u>Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss</u>, dated Jan. 23, 2006), at 8-9)("<u>Plaintiffs' Memo</u>")(ECF Doc. # 19).)  His proposal is based on two incorrect assumptions, and does not work because the revocation order cannot restore the <u>status quo ante</u> or protect innocent parties.

**1.     The Restoration of the <u>Status Quo Ante</u>**

The Court cannot restore the <u>status quo</u> because there is no basis in law to cancel the stock sold through the secondary offering.  Consequently, the Court would have to be able to distinguish between current stockholders who hold shares that were issued under the plan from those whose stock was issued through the secondary offering.  Only the former shares could be cancelled by the Court.  Salsberg conceded at oral argument that the two issues have become commingled as a result of the substantial trading activity.

In addition, even if the Court could determine the provenance of a share of stock, the market activity raises another practical problem. To restore the <u>status quo</u>, the reinstated Notes must be returned to the Noteholders, and the corresponding New Common Stock must be cancelled. If a Noteholder sold its New Common Stock, it could not get the reinstated Note and also keep the proceeds of the stock sale. The Court would have to track the Noteholder's shares, possibly through several purchases and sales, and order the Noteholder to pay the proceeds to the current holder of those shares. This approach would undoubtedly prove difficult and time-consuming, and might not be sufficient to "protect" the current shareholder as required by § 1144. The latter concern leads into a discussion of Salsberg's second erroneous assumption.

**2.    The Protection of Innocent Third-Parties**

At a minimum, the revocation order would have to protect current shareholders who purchased stock in reliance on Trico's post-confirmation financial statements.[1] According to Salsberg, the source of this protection would come from the value added by the reinstated NOLs. (<u>See</u> <u>Plaintiffs' Memo</u> at 7, 18.) NOLs have value because they can be offset against past or future income, and thereby reduce income tax liability. Under 26 U.S.C. § 382, certain types of changes in the ownership or control of a

---

[1]    I do not suggest that this is the only group entitled to protection under § 1144.

9

corporation reduce the available NOLs that can be carried over to offset future income. The parties agree that the plan transactions triggered a change of control and loss of NOLs within the meaning of the tax laws.[2]

According to Salsberg, Trico's financial advisor ascribed a present value to the post-confirmation NOLs of $7.5 million, but if the confirmation order is revoked and Trico's NOLs are reinstated to their pre-confirmation level, they will have a present value in excess of $90 million. (Amended Declaration [of Steven Salsberg], dated Feb. 3, 2006, at ¶¶ 8-9 (ECF Doc # 21).)

The NOLs have been irrevocably lost, however, by operation of the tax laws. The revocation order would necessarily rescind the distribution of the New Common Stock and the warrants, and reinstate the Notes and Old Common Stock. Where property is sold or conveyed, and the transaction is then rescinded, the rescission does not undo the tax effect of the initial transaction unless two factors are present. First, the rescission must occur in the same tax year as the initial transaction. Penn v. Robertson, 115 F.2d 167, 175 (4th Cir. 1940); Rev. Rul. 80-58; 33A AM. JUR. 2D Federal Taxation ¶ 10079, available at Westlaw, AMJUR FEDTAXN P 10079 (2006

---

[2] Their positions also imply that 26 U.S.C. § 382(*l*)(5), which excepts certain changes of control that occur in a bankruptcy case from the general rule that forfeits the NOLs, does not apply.

10

Thomson/West); 2 MERTENS LAW OF FED. INCOME TAX'N § 12A:173 available at Westlaw, MERTENS § 12A:173 (2006 Thomson/West).  The rule is one of practicality, based on the annual accounting principle that "requires the determination of income at the close of the taxable year without regard to the effect of subsequent events."  Penn, 115 F.2d at 175; accord Security Flour Mills Co. v. C.I.R., 321 U.S. 281, 286 (1944).  Second, the parties to the transaction must be returned to the status quo ante.  Hutcheson v. C.I.R., T.C. Memo. 1996-127 (U.S. Tax Ct.); 33 AM. JUR. 2D Federal Taxation ¶ 10079.

Trico argues that Salsberg cannot meet either requirement, and hence, cannot reinstate the NOLs lost through the confirmation and change in ownership.  The plan was confirmed and went effective in 2005.  Trico is a calendar year taxpayer, and the revocation of the confirmation order in 2006 cannot undo the tax effect of the 2005 "transaction."  In addition, as already discussed, the New Common Stock and warrants issued under the plan are not easily cancelled, and the Notes and Old Common Stock cannot be restored to the persons who owned them on the record date.

The annual accounting rule may not raise an insurmountable barrier.[3]  The rationale for the rule is based on the refusal to

---

[3] It would, however, cause problems for those who sold New Common Stock in 2005.  The annual accounting principle would prevent a 2006 rescission from affecting the

revisit gains and losses reported in prior years. The few authorities that have discussed this issue have been concerned with the tax effect in the year of rescission and in prior years. NOLs, on the other hand, carry over to future years. The pre-confirmation NOLs, or some part, may well be capable of reinstatement to offset income in future years without doing violence to the annual accounting principle.

Nevertheless, the cancellation of 10 million shares of New Common Stock issued under the plan, and the restoration of the Notes and Old Common Stock, would undoubtedly trigger another change in control. Thus, Trico would still lose whatever NOLs revocation might otherwise spare.

The second element creates a bigger problem. If the Notes and Old Common Stock are not returned to the former Noteholders and shareholders, the revocation will not restore the parties to the status quo ante. Hutcheson illustrates this point. There, the taxpayer owned Wal-Mart stock that was maintained in a Merrill Lynch brokerage account. Pursuant to his apparent direction, Merrill Lynch sold 100,000 shares in 1989. After the transaction was completed, the taxpayer insisted that he had directed Merrill Lynch to sell $100,000 worth of the stock – 3400 shares – not

---

selling taxpayer's gain or loss in the year of sale.

12

100,000 shares.  In response, Merrill Lynch purchased 96,600 shares in the open market, and restored them to the taxpayer's account.

The Commissioner of Internal Revenue assessed a deficiency for 1989, based on the gain realized from the sale of the 100,000 shares.  The Tax Court concluded that even if the repurchase of the 96,600 was viewed as a rescission of the original sale up to that amount, the repurchase did not restore the parties to the <u>status quo ante</u> – Merrill Lynch repurchased different stock from different sellers.  Accordingly, it did not affect or eradicate the gain from the prior sale.

Here, even if the Court could cancel all of the New Common Stock and restore the Notes and the Old Common Stock, it could not, for the reasons stated, return the Notes and stock to the persons who owned them on the record date.  Under <u>Hutcheson</u>, this would negate the possibility of nullifying the tax effects of the first transaction.

**C.   Salsberg's Authorities**

Finally, Salsberg's authorities do not support the proposition that the revocation of the confirmation order will reinstate Trico's pre-confirmation tax attributes.  He cites several cases involving the effect of a marriage annulment on the taxpayers'

13

prior tax liability. Gersten v. C.I.R., 28 T.C. 756, 769-70 (U.S. Tax Ct.), aff'd in part and remanded in part on other grounds, 267 F.2d 195 (9th Cir. 1957) and Lee v. C.I.R., 64 T.C. 552, 560 (U.S. Tax Ct. 1975) stand for the unremarkable proposition that the Commissioner of Internal Revenue can assess a deficiency against unmarried taxpayers who file a joint return.

In Schackelford v. C.I.R., T.C. Memo. 1995-484 (U.S. Tax Ct.), the court acknowledged that under California law, a marriage annulment related back to erase the marriage from the outset. The California law differed from the federal tax law under which rescission does not relate back unless both of the tests, discussed above, are met. Furthermore, the Schackelford court observed that the relation back rule is conclusive only as between the parties to the annulment proceeding, and refused to apply the rule against the Commissioner of Internal Revenue. Similarly, in Rinehart v. C.I.R., T.C. Memo. 2003-109 (U.S. Tax Ct.), the tax court concluded that it was not bound by the Texas lower court ruling regarding the joint taxpayers' marital status, and upheld the Commissioner's assessment.

## CONCLUSION

The Court grants reargument because it rendered the Opinion before receiving Salsberg's supplemental submission. Upon

14

reargument, I conclude that even if Salsberg could prove fraud, the Court could not fashion a remedy that would satisfy the requirements of § 1144. The Court cannot restore the <u>status quo ante</u> or protect current shareholders who purchased New Common Stock, at least before the Salsberg lawsuit was disclosed in Trico's 2005 Form 10-K.[4] Consequently, his complaint seeking revocation is dismissed. As before, Salsberg is granted leave to amend his complaint within thirty days of the date of this opinion, to seek other, appropriate relief, if any. If Salsberg does not file an amended complaint within that time, Trico may settle an order on notice dismissing this adversary proceeding.

In addition, Salsberg's motion to supplement the record for a second time is denied with one limited exception. The second supplement contains more of Salsberg's financial analysis, and adds little to the analysis in the first supplement except to increase the theoretical value of the NOLs which have been irretrievably lost. On the other hand, the 2005 Form 10-K, which is attached to the second supplement and was issued after the first supplement,

---

[4] The 2005 Form 10-K was filed on February 28, 2006. It included, at page 37, what appears to be the first public disclosure of Salsberg's lawsuit.

will be deemed part of the record.

So ordered.

Dated:   New York, New York
         May 5, 2006

                              /s/ *Stuart M. Bernstein*
                              STUART M. BERNSTEIN
                         Chief United States Bankruptcy Judge