UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 (Confirmed) |
| TRICO MARINE SERVICES, INC., et al., | : | Case No. 04-17985 (SMB) |
| | : | (Jointly Administered) |
| Debtors. | : | |

------------------------------------------------------X

| | | |
|---|---|---|
| STEVEN SALSBERG, ESQ. and | : | |
| GLORIA SALSBERG, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Adv. Proc. 05-2313 (SMB) |
| -- against -- | : | |
| | : | |
| TRICO MARINE SERVICES, INC., | : | |
| TRICO MARINE ASSETS, INC., TRICO | : | |
| OPERATORS, INC., and TRICO | : | |
| INTERNATIONAL, INC. | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------X

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S:**

STEVEN SALSBERG, ESQ.
Plaintiff Pro Se
New York, New York


LAW OFFICE OF JOSEPH P. GARLAND
Attorney for Plaintiff Gloria Salsberg
275 Madison Avenue, Suite 420
New York, New York 10016

      Joseph P. Garland, Esq.
        Of Counsel

KIRKLAND & ELLIS LLP
Attorneys for Defendants
Citigroup Center
153 East 53rd Street
New York, New York 10022

      Matthew Solum, Esq.
      Peter Asplund, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

     This litigation arises from certain testimony given during the debtors'

confirmation hearing held on January 19, 2005.  The plaintiffs, Steven Salsberg

("Steven") and his mother, Gloria Salsberg ("Gloria," and collectively, the "Salsbergs"),

hold warrants distributed under the debtors' confirmed plan (the "Plan").  They contend

that Trevor Turbidy, the debtors' chief financial officer, lied about the debtors' financial

performance during the fourth quarter of 2004, this testimony induced the Court to

confirm the Plan, and the confirmed Plan unfairly wiped out the existing equity,

including Steven's.  Steven subsequently transferred a portion of his fraud-based claim to

Gloria.

     The Court conducted a trial on May 21, 2007, limited to the issue of whether

Turbidy knowingly lied at the confirmation hearing about the debtors' fourth quarter

financial performance with the intent to deceive.  The Salsbergs had requested a limited

trial to avoid the potential expense of a valuation trial in the event the Court concluded

that Turbidy had not knowingly lied.  For the reasons that follow, the Court concludes

that the Salsbergs failed to sustain their burden of proof, and accordingly, their complaint

is dismissed.

# BACKGROUND[1]

The dispute between the parties was the subject of three earlier opinions reported

at <u>Salsberg v. Trico Marine Servs., Inc. (In re Trico Marine Servs., Inc.)</u>, 360 B.R. 53

(Bankr. S.D.N.Y. 2006), <u>Salsberg v. Trico Marine Servs., Inc. (In re Trico Marine Servs.,

Inc.)</u>, 343 B.R 68 (Bankr. S.D.N.Y. 2006) and <u>Salsberg v. Trico Marine Servs., Inc. (In re

Trico Marine Servs., Inc.)</u>, 337 B.R. 811 (Bankr. S.D.N.Y. 2006).  These decisions

explain some of the background, and give context to the trial.

## A.      The Events Leading to the Chapter 11 Petitions

At all relevant times, Trico Marine Services, Inc. ("Trico Services") and its direct

and indirect subsidiaries were engaged in the business of providing marine support

services on a global basis to the oil and gas industry.  (DX A, at I-4.)[2]  Their fleet

consisted of more than 80 vessels used to transport drilling materials, crews and supplies

needed to construct, install, maintain and remove offshore drilling facilities and

equipment.  (<u>Id.</u>)  Trico Services and its domestic subsidiaries — Trico Marine Assets,

Inc. ("Trico Assets") and Trico Marine Operators, Inc. ("Trico Operators") — will be

referred to collectively as "Trico."

Trico's principal obligations consisted primarily of three debts.  First, on May 31,

2002, Trico Services issued $250 million of 8 7/8% Senior Notes due 2012 (the "Senior

Notes"), pursuant to the terms of a senior note indenture, also dated as of May 31, 2002.

---

[1]      The trial transcript is cited as "Tr." followed by the page.  "PX" refers to plaintiffs' trial exhibits and "DX" refers to the defendants' trial exhibits.  Finally, "CH" refers to the transcript of the confirmation hearing held on January 19, 2005.  The entire transcript of the confirmation hearing was received into evidence as DX B.

[2]      DX A, the Disclosure Statement, was not received into evidence.  Both sides nevertheless relied on it at trial and in their post-trial submissions.  Accordingly, the Court deems it to be part of the trial record.

The Senior Notes were unsecured obligations of Trico Services, senior in right of payment to any future subordinated indebtedness.  (Id. at I-5.)  Trico Assets and Trico Operators guaranteed this debt.  Second, on February 12, 2004, Trico Assets and Trico Operators entered into a $55 million credit agreement with several lenders, which was scheduled to mature in 2009 (the "Credit Agreement").  The Credit Agreement debt was collateralized by 43 vessels, together with any revenue earned by the vessels, and a pledge of the capital stock of Trico Operators and Trico Assets.  Trico Services guaranteed the Credit Agreement debt.  (Id.)  Third, Trico Operators and General Electric Capital Corporation were parties to a Master Bareboat Charter, dated September 30, 2002 (the "Master Bareboat Charter"), pursuant to which Trico Operators sold and leased back three of its crew boats. Trico Services and Trico Assets guaranteed the obligations under the Master Bareboat Charter.  (Id.)  Consequently, Trico Services and its two domestic subsidiaries were primarily or secondarily liable for the same principal debts.

In 2001, Trico began to experience declining operating results, and eventually reported operating losses.  (Id. at I-6.)  In July 2003, Standard & Poor's Ratings Services ("S&P") began downgrading Trico's credit ratings, and by the end of April 2004, Trico's publicly traded stock price had declined more than 80% from the beginning of 2004.  Shortly thereafter, S&P placed Trico's corporate credit rating on credit watch.  (Id.)  On May 10, 2004, Trico announced that it would use the 30-day grace period to meet the $11.1 million interest payment, due May 15, 2004, on its Senior Notes.  (Id.)  On June 15, 2004, Trico announced that it would not make the payment of interest due under its Senior Notes within the permitted 30-day grace period, (id. at I-7), and on September 15,

2004, the lenders under the $55 million Credit Agreement accelerated payment of the entire debt.  (Id.)

Given its dire financial situation, Trico began negotiating a "pre-packaged" plan with a noteholder group in June 2004.  The parties agreed to a term sheet embodying a Plan Support Agreement (the "Plan Support Agreement"), and in September 2004, more than 67% of the outstanding Senior Notes agreed to it.  (Id.)  In a nutshell, the Plan Support Agreement provided that Trico's existing common stock (the "Old Common Stock") would be cancelled, and New Common Stock would be distributed to the holders of the Senior Notes (the "Senior Noteholders") in satisfaction of their claims.  The holders of the Old Common Stock would receive warrants, exercisable at the times and prices set forth in the agreement.  (Id.)  Trico's remaining obligations would not be affected.  (Id.)

On November 12, 2004, Trico filed the Disclosure Statement with the United States Securities and Exchange Commission, outlining Trico's Plan.  Exhibit C to the Disclosure Statement included financial projections for revenue and EBITDA[3] from 2004 through 2009.  (Id., Ex. C, at 7.)  For 2004, Trico projected total revenue of $103.7 million, and EBITDA of $13.6 million.  (Id.)  The 2004 projections were based on Trico's actual financial results through September 30, 2004, (id., Ex. A, at 5 (Art. I.A.59)), and the projected results for the fourth quarter.  (See Tr. at 53.)  The Disclosure Statement did not break out the quarterly projections.  At trial, Trico stipulated that as of the date of the Disclosure Statement, Trico had projected fourth quarter revenue and EBITDA of $24.9 million and $4.1 million, respectively.  (Tr. at 40-41.)

---

[3]     "EBITDA" stands for earnings before interest, taxes, depreciation and amortization.

**B.      The Chapter 11 Cases and the Confirmation Hearing**

On December 21, 2004, Trico commenced chapter 11 cases in this Court for the purpose of confirming the pre-packaged Plan.  By then, its estimated total pre-restructuring indebtedness was $389.8 million, (DX A, at I-8), and its annual interest expense for 2004 was estimated to be $32.4 million.  (Id., Ex. C, at 7.)  Of that sum, the Senior Notes accounted for $250 million in principal and $24.8 million in interest.  (See id., Ex. C., at 5, 6.)  The proposed Plan would eliminate this entire Senior Note debt, aggregating approximately $275 million, from the liability side of the balance sheet. Absent confirmation, the projected 2004 EBITDA would fall approximately $19 million short of the amount needed just to pay the 2004 interest expense due on the Senior Notes.

Since all the voting had been completed pre-petition, the Court scheduled a combined hearing to approve the Disclosure Statement and confirm the Plan for January 19, 2005.  On January 10th, Steven filed an objection to the Plan "on behalf of SSRS Partners and all holders of the Common Stock of Trico Marine Services, Inc."  Steven, however, is a non-practicing lawyer who is not a member of the New York bar. Accordingly, he could not represent SSRS or anyone else other than himself.  At the time he filed the objection, he did not personally own any Trico stock, but on January 14, 2005, he acquired 44,000 shares.  (Tr. at 158-59, 161; PX 61, at TR10.)

The combined hearing went forward on January 19, 2005.  The Court approved the Disclosure Statement, (CH at 20), and turned to the Plan.  Trico called one witness, Richard NeJame.  NeJame is a director in the restructuring advisory group at Lazard Freres, (id. at 30), and was qualified to testify as an expert in fields of valuation and restructuring.  (Id. at 32-33.)  He explained that following initial due diligence, he

concluded that Trico's liabilities exceeded its assets, and that it could not meet its obligations as they became due. (Id. at 36.) NeJame and his team then conducted a more exhaustive analysis, and valued Trico using the "comparable companies" and "discounted cash flow" methods. (Id. at 48-49.) The valuation exercise relied on projections prepared by Trico, but NeJame made his own assessment and validated the company's projections. (See id. at 50, 78-79, 81.) After this more extensive analysis, NeJame opined that Trico's total enterprise value fell between $225 million and $245 million, (id. at 49), and if the absolute priority rule were applied, the shareholders would receive nothing, i.e., Trico was insolvent. (Id. at 60-61.) NeJame projected Trico's post-consummation net equity, following the elimination, inter alia, of the liability under the Senior Notes, to be $110 million. (Id. at 49; accord DX A, Ex. C, at 5 (Pro Forma Reorganized Balance Sheet).) In other words, the Senior Noteholders were receiving between 35% and 45% of what they were owed. (CH at 86.)

Steven cross-examined NeJame extensively. NeJame testified that his valuations were based on the information available to him in October. He did not update his analysis based on subsequent events, (see id. at 83-84), and did not know Trico's fourth quarter results. (Id. at 109.) The Senior Notes were currently "trading in the 60s." (Id. at 86-87.) If the trading price was used to determine value, it would add approximately $40 to $50 million to the $110 projection. (Id. at 87.) NeJame also testified that if one substituted the higher revenue projections contained in Steven's objection, Trico's value did not necessarily increase. The financial forecast would involve more risk, and as a result, might require use of a higher discount rate or lower EBITDA multiple. (Id. at 102.) Nevertheless, because a large component of Trico's operating costs were fixed,

between 70% and 80% of any additional revenue would go "straight down to EBITDA."

(See id. at 103-04.)  Consequently, any error in revenue projection would "make a big

difference in the EBITDA bottom line."  (Id. at 104.)  NeJame emphasized, however, that

Trico was projecting — and his valuations assumed — a quadrupling in EBITDA from

2004 to 2008.  (Id.)  If Trico outperformed its projections in the next couple of years, this

would reflect a slight acceleration in the forecasted recovery.  (Id. at 105.)

Trico rested its direct case after NeJame finished, and Steven called Turbidy in his

(Steven's) direct case.  The direct examination began:

> Q:   Good afternoon.  Do you know what the fourth quarter revenues
>      are for Trico?
>
> A:   We have not finished our fourth quarter consolidation yet.  So, no,
>      I don't have an estimate for that number.
>
> Q:   Do you have a preliminary estimate?
>
> A:   I wouldn't be allowed to disclose that under FD[4] at this point.

(CH at 118.)  In addition to the concern expressed by Turbidy regarding Regulation FD,

Trico's counsel questioned the relevance.  He argued that the Plan was based on 20

quarterly projections, and an uptick in one quarter was not material.  (Id. at 120.)  The

Court overruled the objection, and directed Turbidy to answer the question.  (Id. at 121.)

After some further colloquy, the Court posed a question that elicited the following

exchange:

> THE COURT:      Let me ask the question.  What did you project —
>                 did you have a projection for the fourth quarter of
>                 2004?
>
> THE WITNESS:    Yes, we did.
>
> THE COURT:      What was that projection?

---

[4]      Turbidy was referring to SEC Regulation FD, 17 C.F.R. §§ 243.100, et seq.  In general,
Regulation FD prohibits certain non-public, or selective, disclosures of material non-public information
regarding an issuer or its securities.

THE WITNESS:          I don't recall the exact number of revenue
                      projections.

(Id. at 121-22.)  After a brief colloquy, the questioning continued, and Turbidy provided

the following testimony, which forms the core of the Salsbergs' case:

THE COURT:            Do you recall whether your actual experience[5] for
                      the fourth quarter of 2004 was higher, lower, or
                      consistent with the projected results?

THE WITNESS:          In total, 2004 was consistent with our projections.

THE COURT:            Just the last quarter?

THE WITNESS:          It was fairly consistent. Yes. It wasn't spot on,
                      dollar for dollar.

THE COURT:            Is it higher or lower?

THE WITNESS:          I believe it was slightly higher.

THE COURT:            I'll take that answer, they higher – they did better
                      than projected. I understand their concern by
                      disclosing in a court, particularly a preliminary
                      analysis, but they're saying they did better. I think
                      that answers your question.

BY MR. SALSBERG:

Q:      How much better?

A:      Not materially.

(Id. at 122-23.)

        Steven rested after Turbidy testified.  Following argument, the Court overruled

Steven's objection and confirmed the Plan.  Addressing the valuation issue, the Court

relied on NeJame's testimony, concluding that Trico was "hopelessly insolvent," and

anything that equity received by virtue of the Plan Support Agreement was a "gift."  (Id.

at 137.)  The Court did not mention Turbidy or his testimony in its bench decision.

---

[5]     The transcript of the confirmation hearing read "expense" rather than "experience," but the parties
agree that the question was transcribed incorrectly.  (Tr. at 19.)

C.      **This Adversary Proceeding**

Steven did not appeal from the order confirming the Plan.  Instead, after he

transferred some of the warrants distributed under the Plan to Gloria, the Salsbergs

commenced this adversary proceeding on July 19, 2005 to vacate the confirmation order

pursuant to 11 U.S.C. § 1144.[6]  The nub of their claim is that Turbidy committed perjury

when he testified about the actual fourth quarter results, and the confirmation order was,

therefore, procured by his fraud.  The Court ruled, in response to Trico's motion, that it

could not vacate the confirmation order, but granted the Salsbergs leave to amend their

complaint to assert damage claims.  Salsberg v. Trico Marine Servs., Inc. (In re Trico

Marine Servs., Inc.), 337 B.R. 811 (Bankr. S.D.N.Y.), adhered to on rearg., 343 B.R. 68

(Bankr. S.D.N.Y. 2006).  The Court also denied the Salsbergs' motion for leave to further

amend their complaint to assert a claim against Turbidy based on "fraud on the court."

337 B.R. 816.  The Court subsequently scheduled a trial, limited to the issues of falsity

and scienter, i.e., whether Turbidy knowingly lied about the 2004 fourth quarter results

with the intent to deceive.

The trial evidence indicated that by the time of the confirmation hearing, Turbidy

knew that Trico had exceeded its fourth quarter projections of both revenue and

EBITDA.  He had received periodic reports, concerning Trico's performance.  The

---

[6]      Section 1144 provides:

On request of a party in interest at any time before 180 days after the date of the entry
of the order of confirmation, and after notice and a hearing, the court may revoke such
order if and only if such order was procured by fraud. An order under this section
revoking an order of confirmation shall –

(1)  contain such provisions as are necessary to protect any entity acquiring rights in good
faith reliance on   the order of confirmation; and

(2)  revoke the discharge of the debtor.

"October 2004 Financial Statement Highlights" stated that the "Actual Revenue results were dramatically higher than the Model due to" higher utilization rates and reductions to the G & A expense.  The October revenues and EBITDA were $10,402,000 and $3,251,000, respectively.  (PX 5, at TRM010923.)  The "November 2004 Financial Statement Highlights" contained similar language, (see PX 6, at TRM010881), and reported November revenue and EBITDA of $11,004,000 and $2,348,000, respectively. (Id.)  Finally, on January 4, 2005, Turbidy received the "Flash Report" for December that showed revenues of $11,862,000.  (PX 36, at TRM010784.)  The "Flash Report" did not include the December EBITDA.

By the time he testified, Turbidy knew that Trico had achieved actual fourth quarter revenue of $33.3 million, a number still subject to possible downward adjustments based on fuel adjustments and other adjustments to customers.  (Tr. at 25-26, 54, 58.)  Trico had projected $24.9 million in fourth quarter revenues.  Turbidy also knew that Trico had projected that EBITDA for the fourth quarter of 2004 would be $4.1 million, but the aggregate EBITDA for October and November already totaled $5,599,000.  Turbidy was not sure whether he had received information regarding the December 2004 EBITDA by then, (id. at 26), but he understood that two large expenses would hit in December -- one relating to inventory valuation and the other concerning a United Kingdom pension obligation.  (Id. at 34.)

The "December 2004 Financial Statement Highlights," (PX 12, at TRM010810) issued after the confirmation hearing, supplied the missing information.  EBITDA was negative in December, ($459,000), and the parties stipulated that the fourth quarter EBITDA was $5.4 million.  (Tr. at 31.)  Once again, "Actual Revenue was dramatically

higher than the Model," (PX 9, at TRM010835), but operating expenses were also "dramatically higher" due to "special charges" for the UK pension plan ($2.7 million), an adjustment to a redundancy (severance) reserve ($700,000) and an inventory reserve ($1.5 million).  (Id. at TRM010835-36.)

Turbidy testified, in substance, that the UK pension was a recurring charge in the sense that it was recalculated every six months.  (Tr. at 64-65, 115-17.)  Nevertheless, Trico had not expensed any amounts to the UK plan in 2002 or 2003, (PX 48, at 76), and the Disclosure Statement projections did not take a possible end-of-the-year pension charge into account.  (Tr. at 71.)  By the time of the confirmation hearing, Turbidy anticipated an unusually large charge, even if he did not know what the actual number would be.  He knew that the pension charge would "severely impact" fourth quarter EBITDA.  (Id. at 64.)

## D.    The Parties' Contentions

The Salsbergs attribute one misstatement and one omission to Turbidy.  First, they contend that he knowingly made a misrepresentation, or at a minimum, acted with reckless disregard of the truth, and with intent to deceive, when he testified that the 2004 fourth quarter results were fairly consistent and slightly but not materially higher than the fourth quarter projections.  The Salsbergs assert that the actual results were dramatically higher.  Second, the Salsbergs argue that Turbidy fraudulently concealed the fact that the actual fourth quarter EBITDA results were depressed by unusually large special charges. (Plaintiffs' Proposed Findings of Fact & Conclusions of Law, at pp. 45-46, dated June 28, 2007 ("Plaintiffs' Proposed Findings & Conclusions")) (ECF Doc. # 84.)  The defendants

disputed both contentions, and raised several other issues beyond the limited scope of the trial.

## DISCUSSION

### A.    Gloria's Standing

The Court <u>sua sponte</u> raised the question of Gloria's standing.  Steven assigned warrants to Gloria after the confirmation hearing, and her ownership of the warrants formed the basis of her standing in this proceeding.  Under New York law, the assignment of a contract right does not automatically include fraud claims relating to the contract.  <u>Trico</u>, 360 B.R. at 57; <u>see</u> <u>Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank</u>, 57 F.3d 146, 151 (2d Cir. 1995); <u>Fox v. Hirschfeld</u>, 142 N.Y.S. 261, 263-64 (N.Y. App. Div. 1913).  The question is one of the parties' intent.  <u>See Banque Arabe</u>, 57 F.3d at 151-52.

Gloria testified at the trial that Steven orally transferred all claims associated with the warrants at the time of the assignment, (Tr. at 154-55), and specifically mentioned fraud claims.  (<u>Id.</u> at 157.)  Steven confirmed her account.  (<u>Id.</u> at 160-61.)  Their testimony supports the finding that Steven transferred whatever fraud claim he owned that was connected with the  transferred warrants, and accordingly, Gloria has standing to assert the fraud claim in this adversary proceeding.[7]

---

[7]       Trico had also questioned Steven's standing.  Although he did not personally own any shares of Old Common Stock when he filed his objection to confirmation, Steven owned Old Common Stock at the time of the confirmation hearing.  Accordingly, he has standing to assert the fraud claim in this case.

**B**      **The Fraud Claim**

The Salsbergs relied on New York law in identifying the elements of their fraud

claim.  (See Plaintiffs' Proposed Findings & Conclusions, at pp. 39-40, 46-48)(ECF Doc.

# 84.)  Trico did not challenge their reliance on New York law, and the Court will,

therefore, apply it.[8]  Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir.

2000)(if both sides treat New York law as controlling in their memoranda, this is

sufficient to establish New York as the governing law).  "A New York common law

fraud claim is defined as a representation of fact, which is untrue and either known by

defendant to be untrue or recklessly made, which is offered to deceive and to induce the

other party to act upon it, and which causes injury."  Suez Equity Investors, L.P. v.

Toronto-Dominion Bank, 250 F.3d 87, 104 (2d Cir. 2001); Jo Ann Homes at Bellmore,

Inc. v. Dworetz, 250 N.E.2d 214, 217 (N.Y. 1969).

To establish the elements of a fraudulent concealment claim, the plaintiff must also

show that the defendant had a duty to disclose the material information.  Banque Arabe,

57 F.3d at 153.  A duty to disclose may arise from the need to clarify a prior partial or

ambiguous statement, or from a fiduciary or confidential relationship between the parties.

Id. at 155.  A duty to disclose may also arise if  "(1) one party has superior knowledge of

certain information; (2) that information is not readily available to the other party; and (3)

the first party knows that the second party is acting on the basis of mistaken knowledge."

Id.

---

[8]        In any event, the elements of fraud under New York law and federal common law are the same.
Marcus v. AT&T Corp., 138 F.3d 46, 63 (2d Cir. 1998); accord Seanto Exports v. United Arab Agencies,
137 F.Supp.2d 445, 451 (S.D.N.Y. 2001).

### 1.       Turbidy's Actual Misstatement

Trico projected revenue and EBITDA of $24.9 million and $4.1 million, respectively, in the fourth quarter.  It achieved actual revenue and EBITDA of $33.3 million and $5.4 million, respectively.  Thus, Trico outperformed its revenue and EBITDA projections by 33.73% and 31.71%, respectively.  When questioned about Trico's "actual experience" compared to the projections, Turbidy testified that the preliminary results were "fairly consistent" with the projections, but were not "spot on" "dollar for dollar," that they were "slightly higher" but not "materially better."  Focusing on the percentage relationship between the projected and actual results, the Salsbergs contend that the actual results were dramatically better, and that Turbidy committed fraud by minimizing the disparity.

At the outset, the Salsbergs maintain that Turbidy was talking about revenue, but according to Turbidy, he was focusing on EBITDA.  (Tr. at 96-97, 135-36.)  The dispute is largely immaterial under the Salsbergs' theory because the percentage changes were approximately the same.

In any event, I find that Turbidy testified credibly when he said that his answers were focusing on EBITDA, not revenue.  The questions were admittedly vague.  At one point, he was asked about "revenue," but I subsequently asked Turbidy about Trico's "actual experience."  He answered the question with reference to EBITDA because EBITDA (and cash flow) directly reflected Trico's financial health and the ability to pay its bills.  (Tr. at 44, 63, 86.)  Trico's 2004 Form 10K, published after the confirmation hearing, supports the testimony regarding his mindset.  It noted that during the reorganization, Trico focused primarily on cash flow from operations and net changes in

15

cash and cash equivalents in order to fund operations, maintain the fleet and service its debt. (PX 48, at 23.)

Turbidy also testified that his statements about materiality were not directed at a comparison between the projected and actual EBITDA results. Instead, he was referring to Trico's EBITDA in relation to Trico's overall valuation based upon his understanding that the purpose of the hearing was to determine the valuation of Trico. (Tr. at 97.) Indeed, this was the purpose of NeJame's testimony. Thus, when Turbidy testified that fourth quarter EBITDA was slightly but not materially higher, he was referring in general to the valuation of Trico, and specifically, to the effect that the slightly higher quarterly EBITDA had on Trico's ability to meet a $9 million quarterly interest expense. (See id. at 101-02, 106-07.)  I also find this testimony credible.

In light of Turbidy's credible testimony, I conclude that the Salsbergs failed to demonstrate that Turbidy's testimony was false. The last comprehensive financial snapshot that Turbidy saw prior to the confirmation hearing, the December 29, 2004 e-mail and accompanying November 2004 financials (PX 6), showed a company teetering on the brink of survival. Despite the positive revenue and EBITDA in November, Trico had still booked approximately $2.23 million in net operating losses. (Id. at TRM010871.)  Furthermore, Trico's two barometers of health, changes in cash flow from operations and net changes in cash position, were headed in the wrong direction. During November, Trico booked $3.13 million in negative operating cash flow, (id. at TRM010870), and its cash had declined by $2.55 million. (Id. at TRM010873.)  Trico had also suffered net operating losses and negative operating cash flow during the first two months of the fourth quarter, (id. at TRM010870-71), and its cash had declined in the

16

approximate amount of $3.8 million.  (Id. at TRM010873.)  Year to date, Trico had

experienced net operating losses of $49.4 million, (id. at TRM010871), negative

operating cash flow of over $10 million, (id. at TRM010873), and a $9.4 million decrease

in cash.  (Id. at TRM010873.)  In short, the relevant financial criteria spelled trouble for

Trico.

The fourth quarter and annual results, published after the confirmation hearing,

confirmed Trico's bleak financial prospects.  During December 2004, net operating

losses totaled $8.5 million, (PX 12, at TRM010810), negative cash flow from operations

was $4.5 million, (id. at TRM010811), and cash declined by $3.3 million.  (Id. at

TRM010813)  According to the 2004 Form 10K, Trico suffered a net operating loss of

almost $48.7 million in 2004, (PX 48, at 43), cash flow from operating activities declined

by $14.76 million, (id. at 45), and cash and cash equivalents dropped by $12.7 million.

(Id.)  "Management's Discussion and Analysis of Financial Condition and Results of

Operation" stated that "2004 has been a difficult year," and Trico's "key markets

remained depressed throughout much of the year, driving operating results and cash

flows to deteriorate substantially."  (PX 48, at 22.)  Although day rates and utilization

rates in Trico's key markets "experienced some rebound" from three–year lows during

the second half of 2004 and early 2005, as a result of increased repair and maintenance

work generated by a Gulf of Mexico hurricane and less competition in the North Sea spot

market, there was no assurance that this would continue.  (Id.)

Viewed against this bigger picture — the picture that Turbidy was viewing — the

extra $1.3 million of EBITDA was only "slightly" higher than the projections.  Moreover,

coupled with NeJame's testimony that Trico had negative equity of approximately $240

million, the Salsbergs failed to show that the extra $1.3 million reflected materially better

performance, materially affected Trico's enterprise value, or turned Trico's red ink to

black. [9]

I also conclude that the Salsbergs failed to demonstrate that Turbidy intended to

deceive the Court.  Having observed his demeanor while testifying, I found him to be

honest, candid and forthright.  I conclude that when he testified at the confirmation

hearing, he held the honest belief that the actual results for the fourth quarter EBITDA,

which were not then final and were subject to credit and other adjustments, including a

large UK pension charge, would not be appreciably higher or materially better than the

fourth quarter EBITDA projection.  In reaching this conclusion about his credibility, I

reject the Salsbergs' contention that Turbidy was biased, or that the option to purchase

New Common Stock, granted to Turbidy under the Plan, (see DX A, at I-9), or any other

personal benefits that might be conferred upon him under a confirmed Plan, turned him

into a perjurer.

### 2.    Turbidy's Fraudulent Concealment

The Salsbergs also contend, in substance, that even if Turbidy's testimony was

technically correct, he should have voluntarily disclosed that the "slightly" but not

"materially" better fourth quarter EBITDA was negatively impacted by three special,

---

[9]    Although the materiality and valuation issues were severed at the Salsbergs' request, some of the
same evidence was relevant to the issues of falsity and Turbidy's intent to deceive.  For example, the
Salsbergs challenged the testimony that the actual fourth quarter results were not "materially" better than
the projections.  To establish falsity, the Salsbergs had to show that the actual fourth quarter results were
"materially" better.  Similarly, a lack of materiality would cut against a motive to lie, and hence, the
inference that Turbidy intended to deceive anyone.  Cf. In re Trex Co. Secs. Litig., 454 F. Supp. 2d 560,
586 (W.D. Va. 2006)("any allegation of scienter based on the defendants' alleged knowledge or reckless
disregard of the falsity of statements or omissions that the court has herein found to be immaterial must fail
as a matter of law").  The bifurcation of the materiality and valuation issues did not free the Salsbergs from
the obligation to adduce evidence of materiality or valuation to the extent the evidence was relevant to the
questions of falsity or intent.

unusually large expenses — the $2.7 million UK pension charge, the $1.5 million inventory reserve and the $700,000 severance reserve.  Without these expenses, the fourth quarter EBITDA would have been $10.3 million.

The Salsbergs do not argue that Trico was guilty of any accounting improprieties, and there is nothing in the record to suggest it was.  Accordingly, I conclude that it was appropriate, as an accounting matter, to deduct these expenses from income in computing the actual EBITDA.  Hence, the EBITDA was accurately stated.  Consequently, the question comes down to the following:  although the special charges were properly deducted from income in arriving at the fourth quarter EBITDA, did Turbidy nevertheless have a duty to disclose that the actual fourth quarter EBITDA reflected a reduction based on the three special charges?

I have no trouble concluding that in general, Turbidy had a duty of candor, and hence, a duty to disclose material information; he was the chief financial officer of the debtor in possession.  I find, however, that the Salsbergs failed to prove that Turbidy intended to deceive the Court or anyone else by failing to highlight the special charges.  First, there is no evidence that Turbidy was aware of the impending charge for the $700,000 redundancy (severance) reserve.  He testified that he foresaw the UK pension charge and the inventory reserve.  (Tr. at 34.)  Second, he never testified that the inventory reserve (ultimately, $1.5 million) was not taken into account when Trico made

its 2004 projections.  The only testimony was that the UK pension expense had not been

considered.[10]  (Id. at 71.)

     Third, and most importantly, the Salsbergs failed to show that Turbidy intended to

deceive anyone when he referred to the fourth quarter EBIDTA, without stating that the

result included the special UK pension charge.  The Court has already found that Turbidy

testified honestly and candidly at the confirmation hearing.  Moreover, an increase of

$2.7 in fourth quarter EBITDA would have been insufficient to cover the $9 million

quarterly interest expense or the $19 million annual shortfall in the interest expense on

the Senior Notes, and there is no evidence that it would have made a dent in the over

$200 million in negative equity.  The lack of any material effect further undercuts a

finding of intent to deceive.

     The Salsbergs point out that Turbidy mentioned the UK pension charge during a

May 11, 2005 "Earnings Call" with outsiders.  Comparing the 2004 fourth quarter and

2005 first quarter vessel operating expenses, he stated that the fourth quarter expenses

were $3.9 million higher,[11] but that "it's important to note that included in the fourth

quarter of 2004 with a charge of 2.1 million [sic] for our UK pension plan."  (PX 56, at

4.)  It is apparent from the conversation that Turbidy was being conservative, and was

trying to avoid the impression that Trico had drastically cut its vessel operating expenses.

I do not infer from this that Turbidy intended to hide the same information at the

---

[10]     There was no evidence that Trico foresaw the charge at the time that the projections were
prepared.

[11]     The transcript of the call is a bit confusing.  Initially, Turbidy seemed to say that the 2005 first
quarter expenses had actually increased by $3.9 million.  It appears, however, from the balance of the
statement that the costs had decreased by that amount.

confirmation hearing.  The disclosure the Salsbergs would require would have had the opposite effect, suggesting that Trico's operations were more profitable than its books and records reflected.

Thus, the Salsbergs failed to show that Turbidy had any motive to conceal the information.  Accordingly, I decline to find that he intended to deceive the Court or the parties when he testified at the confirmation hearing about the fourth quarter EBITDA, but failed to disclose that the result reflected an unusually large UK pension charge.

## C.      Burden of Proof

Finally, the parties argue over whether the Salsbergs had to prove their fraud claim by clear and convincing evidence or by a preponderance of the evidence.  I conclude that they failed to satisfy their burden under either standard.

The foregoing constitutes the Court's findings of fact and conclusions of law in accordance with FED. R. CIV. P. 52(a), made applicable by FED. R. BANKR. P. 7052.  The clerk is directed to enter a final judgment dismissing this adversary proceeding.

Dated: New York, New York
        August 23, 2007

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
Chief United States Bankruptcy Judge

21